# EXHIBIT 2

# EXHIBIT C

**BLANK ROME LLP**
Charles A. Fitzpatrick IV, Esq. (No. 309113)
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
Phone: (215) 569-5600
Facsimile: (215) 832-5608
Charles.Fitzpatrick@BlankRome.com

**BLANK ROME LLP**
Linda Kornfeld (pro hac vice forthcoming)
2029 Century Park East, 6th Floor
Los Angeles, California 90067
Phone: (424) 239-3400
Facsimile: (424) 239-3434
Linda.Kornfeld@BlankRome.com

*Counsel for Plaintiff*
*Comcast Spectacor, LLC*

*Filed and Attested by the*
*Office of Judicial Records*
*08 JUN 2023 10:28 am*
*B. MERCEDES*

| | | |
|---|---|---|
| **COMCAST SPECTACOR, LLC** | : | COURT OF COMMON PLEAS |
| 3601 South Broad Street | : | PHILADELPHIA COUNTY |
| Philadelphia, PA 19148 | : | |
| | : | COMMERCE PROGRAM |
| Plaintiff, | : | |
| | : | JUNE TERM, 2022 |
| v. | : | |
| | : | CIVIL ACTION - LAW |
| **FACTORY MUTUAL INSURANCE** | : | |
| **COMPANY** | : | Case ID No. 220602694 |
| P.O. Box 7500 | : | |
| Johnston, RI 02919 | : | *Jury Trial Demanded* |
| | : | |
| Defendant. | : | |

## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| **You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written** | **Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace** |

appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint of for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

*You should take this paper to your lawyer at once. If you do not have a lawyer or cannot afford one, go to or telephone the office set forth below to find out where you can get legal help.*

Philadelphia Bar Association
Lawyer Referral and Information Service
1101 Market St., 11th Floor
Philadelphia, Pennsylvania 19107
(215) 238-6333

falta ascentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

*Lleve esta demanda a un abogado immediatamente. Si no tiene abogado o si no tiene el dinero suficiente de pagar tal servicio. Vaya en persona o llame por telefono a la oficina cuya direccion se encuentra escrita abajo para averiguar donde se puede conseguir asistencia legal.*

Asociacion De Licenciados
De Filadelfia
Servicio De Referencia E
Informacion Legal
1101 Market St., 11th Piso
Filadelfia, Pennsylvania 19107
(215) 238-6333

2

Case ID: 220602694

**TO:** <u>Factory Mutual Insurance Company</u>

**YOU ARE HEREBY NOTIFIED TO PLEAD TO THE ENCLOSED COMPLAINT WITHIN TWENTY (20) DAYS FROM SERVICE HEREOF OR A JUDGMENT MAY BE ENTERED AGAINST YOU.**

<u>   /s/ Charles A. Fitzpatrick IV   </u>
*Attorney for Plaintiff*

**BLANK ROME LLP**
Charles A. Fitzpatrick IV, Esq. (No. 309113)
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
Phone: (215) 569-5600
Facsimile: (215) 832-5608
Charles.Fitzpatrick@BlankRome.com

**BLANK ROME LLP**
Linda Kornfeld (pro hac vice forthcoming)
2029 Century Park East, 6th Floor
Los Angeles, California 90067
Phone: (424) 239-3400
Facsimile: (424) 239-3434
Linda.Kornfeld@BlankRome.com

*Counsel for Plaintiff*
*Comcast Spectacor, LLC*

| | | |
|---|---|---|
| **COMCAST SPECTACOR, LLC** | : | COURT OF COMMON PLEAS |
| 3601 South Broad Street | : | PHILADELPHIA COUNTY |
| Philadelphia, PA 19148 | : | |
| | : | COMMERCE PROGRAM |
| Plaintiff, | : | |
| | : | JUNE TERM, 2022 |
| v. | : | |
| | : | CIVIL ACTION - LAW |
| **FACTORY MUTUAL INSURANCE** | : | |
| **COMPANY** | : | Case ID No. 220602694 |
| P.O. Box 7500 | : | |
| Johnston, RI 02919 | : | *Jury Trial Demanded* |
| | : | |
| Defendant. | : | |

*Filed and Attested by the Office of Judicial Records 08 JUN 2022 10:28 am B. MERCEDES*

## COMPLAINT AND JURY DEMAND

Plaintiff Comcast Spectacor, LLC ("Comcast Spectacor") complains of Defendant Factory Mutual Insurance Company (hereinafter "Factory Mutual") and alleges as follows:

## NATURE OF THIS ACTION

1.      Comcast Spectacor is a leader in the sports and entertainment industry. Headquartered in Philadelphia, Comcast Spectacor's portfolio includes the National Hockey League's Philadelphia Flyers, the Wells Fargo Center, Spectacor Gaming, Spectacor Events & Entertainment, the Overwatch League's Seol Infernal, and more.

2.      Fans in the stands is at the core of Comcast Spectacor's revenue.  The function of Comcast Spectacor's properties depends on their ability to house hundreds or thousands of tightly packed fans in indoor spaces who talk, cheer and scream in close proximity.

3.      Despite its best efforts to navigate the risks presented by the Coronavirus pandemic (the "Pandemic") and to mitigate the damage the Pandemic caused to their property and business, Comcast Spectacor (for ease of reference, referred to herein as the "Flyers") has incurred and continues to incur substantial loss caused by the dangers of Coronavirus and the resulting interruption of its business activities.

4.      Because of the near certain risk of physical harm created by Coronavirus, the Flyers were forced to cancel or significantly restrict in-person attendance at their games at the Wells Fargo Center.  Beginning in March 2020, due to the presence of individuals who had contracted COVID-19 on the premises and the risk that the incidence of infections would grow exponentially if extreme preventative actions were not taken, the Flyers were required to cease operations entirely, or severely restrict access to their covered premises.

2

Case ID: 220602694

5.     The Flyers were prevented from using its covered facilities not only for Flyers events, but also for multiple other high profile and high-revenue generating events, such as other sporting and gaming events and star-studded concerts.

6.     The Flyers purchased property insurance to protect against this type of catastrophic loss.  By the express terms of the all-risks commercial property policy (the "Policy") that Defendant Factory Mutual sold to Plaintiff, Factory Mutual promised to pay for losses resulting from the necessary suspension of business operations, in circumstances such as those at issue, here.

7.     Befitting the top dollar that the Flyers paid for best-in-class insurance coverage, the Policy promises to afford broad protections against the risks of pandemic-related losses. Among other coverages, the Policy provides distinct coverages for (1) property loss, "Time Element" (business interruption) loss, and Extra Expenses resulting from the "risks" associated with the Pandemic; and (2) "Communicable Disease Response" and "Interruption by Communicable Disease" coverages for certain narrow specified amounts incurred in response to an identified incident of communicable disease at the insured's properties.

8.     Factory Mutual has not honored the terms of its Policy in responding to the Flyers' coverage claim.  Factory Mutual has not acknowledged coverage beyond the limited "Communicable Disease Response" and "Interruption by Communicable Disease" coverages in the Policy.  Factory Mutual has failed to pay for the physical loss or damage to property and business interruption that the Flyers have incurred and continue to incur because of the presence of and risks presented by the Pandemic, even though the Policy expressly provides coverage for such physical loss or damage to the Flyers' property, and other covered property, and the risks thereof.

3

Case ID: 220602694

9.      In total, the Policy provides coverage of up to $500 million per-occurrence ($100 million Time Element loss per-occurrence) for precisely the types of losses incurred by the Flyers and at issue in this Action.  But Factory Mutual has limited coverage to the $1 million aggregate sublimit for Communicable Disease coverage.

10.      The insuring agreement in the Policy covers property "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded." (emphasis original).  Under the Policy's express terms, coverage is provided to the Insured where, among other circumstances, the Flyers' use of its property is prevented, diminished or restricted to prevent the spread of Coronavirus and resulting loss or damage to the covered premises.  Due to the Pandemic, the Flyers' covered premises were rendered essentially nonfunctional and unusable for the large-event gatherings for which they had at all times been used before the Pandemic's onset, depriving the Flyers of the physical use intended for its premises and causing them to suffer physical loss of the insured premises.  The premises also suffered physical damage or the imminent threat of physical damage due to the impact that the Coronavirus had and imminently would have had to the airspace and other physical components of the premises.

11.      The dangers posed by the Coronavirus have caused the Flyers to incur substantial losses.  These risks rendered covered premises, at least temporarily, unreasonably dangerous, uninhabitable and/or unfit for their intended functions.

12.      In the alternative, COVID-19 was present on the property, and altered the air and surfaces therein. This alteration rendered the property dangerous, forcing closure and other restrictions on the use of the premises.

13.      The Flyers suffered physical loss or damage to their property due to the presence, or risks of the presence, of Coronavirus and/or COVID-19 at its premises, which did or would

4

Case ID: 220602694

have physically and tangibly altered the airspace within its premises and their surfaces from a safe and functional condition to a dangerous and potentially lethal and essentially non-functional condition, or would have caused such physical impact, absent the extreme preventative and costly remedial measures that the Flyers employed.

14.     Contrary to its promise to cover such physical loss or damage to property and the risks thereof, Factory Mutual has failed to honor its coverage obligations under the Policy. Plaintiff thus seeks the declaratory relief addressed below in this Complaint.

## THE PARTIES

15.     Comcast Spectacor, LLC is a Pennsylvania limited liability company with its principal place of business and headquarters in Philadelphia, Pennsylvania.

16.     Factory Mutual Insurance Company is a Rhode Island corporation with its principal place of business in Johnston, Rhode Island, and is licensed to transact, and is regularly transacting, business in the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

17.     The Court has subject matter jurisdiction pursuant to 42 Pa.C.S. § 931(a).  This Court has the power to declare the parties' rights and obligations pursuant to 42 Pa.C.S. § 7532.

18.     This Court has personal jurisdiction over Defendant Factory Mutual because it transacted and continues to transact the business of selling insurance in this Commonwealth and has purposefully availed itself of this jurisdiction.

19.     Venue is proper pursuant to Pennsylvania Rule of Civil Procedure Rule 1006 and 42 Pa.C.S. § 931(c) because Factory Mutual's business activities within this County subject it to personal jurisdiction and a substantial part of the transactions or occurrences giving rise to the

5

claim occurred in this County, including, *inter alia*, the delivery of the Policy and the breach

thereof.

## THE FACTORY MUTUAL INSURANCE POLICY

20.    As a large international property-only insurer, Factory Mutual, part of the FM

Global Group, directs substantial annual resources to studying risks and those that may in the

future cause loss to policyholders and deciding which risks it is willing to cover and those that it

intends to avoid.[1]

21.    As addressed in various regulatory filings with state insurance departments,

Factory Mutual introduced its standard property policy decades ago.  As shown in such filings,

Factory Mutual modified its standard form from time to time.  The Global Advantage® All-Risk

Policy sold to the Flyers was issued on standard form "Advantage – TE Select – United States –

2016 (2019 update)."

22.    In marketing its Global Advantage® All-Risk Policy, Factory Mutual advertises

that, "The all-risk FM Global Advantage® policy, backed by large, stable capacity, is a superior

insurance product designed to help your business remain resilient. With our standard policy,

you'll find unrivaled value in clear, comprehensive policy language recognized as the industry

standard and trusted by more than one-third of Fortune 1,000 companies."[2]

23.    Factory Mutual advertises, "The FM Global Advantage® policy is one of the

broadest in the insurance market. If you need the ability to scale policy options to fit your actual

properties and exposures, you'll appreciate our Business Interruption Coverage. It protects against

---

[1] *See* https://www.fmglobal.com/about-us/why-fm-global ("You'll discover that our approach to claims is different, too. We work closely with you *before, during* and *after* a loss—no matter where in the world that loss occurs. And we ground our recommendations in world-class scientific research and on-the-ground engineering services") (emphasis original) (last visited May 31, 2023).

[2] See https://www.fmglobal.com/about-us/why-fm-global/your-choice (last visited May 31, 2023).

Case ID: 220602694

loss of income following a disaster, wherever you operate, or however indirect your connection to the loss."[3]

24.     In addition to Factory Mutual's knowledge of the sports and entertainment industry business in general, and in connection with providing coverage to the Flyers, Factory Mutual engaged, or had reasonable opportunities to engage in, an extensive underwriting investigation and to become familiar with and knowledgeable about the nature and scope of the Flyers' business and the nature of the risks against which it was insuring.

25.     In exchange for substantial premiums, Factory Mutual sold to Comcast Spectacor, LLC Policy Number 1052894, effective from March 31, 2019 to March 31, 2020.  Upon expiration of that policy, Factory Mutual issued Policy Number 1063400, effective from March 31, 2020 to March 31, 2021, on substantially similar terms.  A true and correct copy of Policy Number 1063400 (the "Policy") is attached hereto as Exhibit 1 and incorporated by reference as if in full.

### *The Broad Coverage the Policy Grants for Property Damage and Time Element Loss*

26.     The applicable coverages granted by the Policy include insurance for property loss and time element (business interruption) loss resulting from all risks of physical loss or damage to covered property.

27.     The Insuring Agreements in the Policy granting these coverage state that the "Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy," and "TIME ELEMENT loss…directly resulting from physical loss or damage of the type insured" to covered property.

---

[3] *Id.*

Case ID: 220602694

28.     This coverage extends to losses resulting from the "risks of" direct physical "loss" *or* "damage" to the Flyers' property, and applies even if the Flyers' property did not, in fact, suffer actual damage.

29.     As used in the Policy, the term "physical loss" is separate, distinct, and has an independent meaning from the term "physical damage."

30.     The Policy does not define "physical."

31.     The Policy does not define "loss."

32.     The Policy does not define "physical loss."

33.     The Policy does not define "damage."

34.     The Policy does not define the phrase "physical loss or damage."

35.     The Policy does not define the terms "risks" or "risks of."

36.     The Policy does not define the phrase "risks of physical loss or damage."

37.     When undefined, the phrases "physical loss or damage" and "risks of physical loss or damage" are susceptible to more than one reasonable interpretation.

38.     When the undefined phrases "physical loss or damage" and "risks of physical loss or damage" are susceptible to more than one reasonable interpretation, they should be construed against the drafter (which, here, is Factory Mutual).

39.     Dictionary definitions of "loss" include:

   a.   "Deprivation."  Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss[4]

   b.   "[D]ecrease in amount, magnitude, or degree." Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss

---

[4] As of the time of the Flyers' initial loss, *Merriam-Webster* included "deprivation" as a definition of "loss."  That definition has since been removed for reasons unknown to the Flyers.

8

Case ID: 220602694

c.  "[T]he fact that you no longer have something or have less of something."
Loss, Cambridge Dictionary,
https://dictionary.cambridge.org/us/dictionary/english/loss?q=Loss

d.  "[H]<u>aving</u> less than before."  Loss, Macmillan Dictionary,
https://www.macmillandictionary.com/us/dictionary/american/loss

e.  "[T]he state of no longer having something or as much of something." Loss,
Oxford Advanced Learner's Dictionary,
https://www.oxfordlearnersdictionaries.com/us/definition/english/loss?q=loss

40.     At minimum, the Flyers suffered "deprivation," "decrease," or "having less" of its covered property due to the Pandemic.

41.     Upon information and belief, Factory Mutual is aware of numerous court decisions previously concluding that insureds have properly alleged or are in fact entitled to coverage for Coronavirus-related business interruption loss or damage.  Upon information and belief, Factory Mutual is aware of these court decisions, many of which are in the Commonwealth of Pennsylvania, including the Superior Court's decision in *Ungarean v. CNA,* 2022 PA Super 204, 286 A.3d 353 (2022).  Because numerous courts agree that Coronavirus and/or the Pandemic may cause "direct physical loss or damage" to property, the Flyers' belief that the Policy provides coverage is at least reasonable even if Factory Mutual claims that it believes there is no coverage.

42.     Moreover, over the course of decades, courts have held that the presence of a dangerous (to humans) invisible substance at or on a property, including within the airspace of a covered premises, constitutes "physical loss or damage" to property.  Many courts have also held that the restriction of use of property due to an imminent risk of danger to its inhabitants constitutes "physical loss" to property.[5]

---

[5] *See, e.g.,* Richard P. Lewis, Lorelie S. Masters, Scott D. Greenspan & Chris Kozak, *Couch's 'Physical Alteration' Fallacy: Its Origins and Consequences,* 56 Tort & Ins. L. J. 621 (Fall, 2021), attached hereto as Exhibit 2.

Case ID: 220602694

43.     This has been the rule of law in the Third Circuit for years, and Factory Mutual certainly has been aware of it since at least 2002, when its sister company (Affiliated FM) was a party to *Port Authority of New York and New Jersey v. Affiliated FM Insurance Co.*, 311 F.3d 226, 235 (3d Cir. 2002).  In that case (decided on summary judgment and based upon a fulsome evidentiary record), the Court acknowledged that "physical loss" under a property policy can be established where the imminent release of an invisible substance into the airspace of a covered property presents a significant enough health hazard to people occupying the premises that it impairs the building's function or utility.  *See also Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826 (3d Cir. 2005) (issue of fact existed as to whether e-coli in the well water used by a homeowner had sufficient enough impact on the function and use of the home to constitute direct physical loss or damage).

44.     The Third Circuit's decision in *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131 (3d Cir. 2023) does not negate the Flyers' coverage claim.  Although a consideration of both the broader terms of Factory Mutual's policy and the ruling in *Ungarean, supra,* mandate more permissive standards than applied in *Wilson*, the Flyers allege both physical damage and physical loss to their property under *Wilson's* standards.

45.     Based on *Port Authority* and other cases considering invisible substances harmful to human health, *Wilson* reiterated that "the term 'loss' can include *loss of use*" where the policyholder alleges, e.g., that the substance is present "in such a form or quantity as to make the property dangerous," reducing its use "to a substantial degree," or rendering it "useless or uninhabitable." *Wilson*, 57 F.3d at 142, 144 (emphasis added) (relying on, *e.g., Port Auth.*, 311 F.3d at 236).

46.     *Wilson* also reiterated that policyholders may establish physical loss by showing "*that there was an imminent risk*" that a dangerous condition that has not yet materialized would "nearly eliminate[] or destroy[]" the "functionalities of their properties" or make their structures "useless or

10

uninhabitable." *Id.* at 142 (emphasis added). In other words, according to the Court, and consistent with *Port Authority*, "actual" harm is not necessary, alleging its "threat" is sufficient.

47.     Upon information and belief, Factory Mutual is also aware that the Pennsylvania Supreme Court has not issued a decision interpreting the undefined phrase "direct physical loss or damage," either before or after the Pandemic.

48.     Despite the industry-wide introduction of the term "direct physical loss or damage" decades ago, Factory Mutual, like other property insurers, has elected not to define that phrase in its commercial property policies, including the Policy it sold to the Flyers for substantial premiums.

49.     Insurance industry expert Ty Sagalow has opined that insurers like Factory Mutual carefully and deliberately choose the policy language they wish to employ when drafting an insurance policy.  *See* Certification of Ty R. Sagalow, dated October 1, 2021 ("Sagalow Certification") ¶ 25, publicly filed in the action styled as *Tory Burch LLC v. Zurich Am. Ins. Co.*, Docket No. UNN-L-000829-21 (N.J. Super. Ct., Union Cty.), attached hereto as Exhibit 3. Specifically, "policy drafting typically is a rigorous and time-consuming exercise, frequently involving up to a dozen or more individuals, especially in large organizations…. Every word, and indeed sometimes every punctuation, may be examined and be subject to argument and debate. All prior versions of the policy are typically reviewed and compared.  All major competitor forms are reviewed, compared, and sometimes laid out in detailed spreadsheets. Wording is compared and debated between underwriting, claims, legal/compliance, business development and others. Differences between the proposed policy language and that contained in prior policy forms, and between other policies available from the particular carrier and its competitors are examined and debated from both a claims perspective and an underwriting perspective, as well as, inevitably, from a sales perspective. The information gleaned from the insurance marketplace as a whole,

Case ID: 220602694

including positions taken by drafting and rating industry organizations and regulatory bodies, are reviewed, especially with respect to any "hot" or 'emerging' issues." *Id.*

50.     As thoroughly researched and explained by insurance claims expert Charles Miller, the coverage provided by property policies covering business income loss has continually been expanded since inception to cover "loss" exposures beyond actual damage or destruction to property. *See* Expert Report of Charles M. Miller ("Miller Declaration") publicly filed in the matter *Trapped Escape Room LLC d/b/a Trapped Escape Room v. HCC Specialty Insurance Company*, No. 4:20-cv-03782 (S.D. Tex. Aug. 2, 2021), attached hereto as Exhibit 4.

### Representations Factory Mutual Previously Made to State Insurance Regulators, in Court Filings and Elsewhere Contradict the Reading of the Undefined Trigger of Coverage Terms "Physical Loss or Damage" It Now Advocates

51.     In other similar litigation over coverage for Pandemic-related losses, Factory Mutual has stated that the presence of COVID-19 at an insured location does not constitute physical loss or damage to property. That assertion is contrary to Factory Mutual's own admissions.

52.     Factory Mutual's conflicting interpretations of the phrase "physical loss or damage" as applied to Coronavirus has been revealed in a COVID-19 coverage case in the Eastern District of Texas.  One of the documents produced by Factory Mutual in *Cinemark Holdings, Inc. v. Factory Mut. Ins. Co*, shows that on March 4, 2020, FM's Operations Vice President & Senior General Adjuster (Jason Wing) emailed an FM Operations Claims Manager (Richard Sunny) regarding the meaning of "physical loss or damage." *See* Exhibit 5.

53.     Mr. Wing sent Mr. Sunny an FM loss code (Loss Code 60) from FM's own claim handling system for claims for "physical loss or damage which results from the actual presence of a communicable disease and the associated business interruption as defined in the policy." *Id*.

12

Case ID: 220602694

54.     Such a Loss Code allows an insurance carrier to "bucket" (i.e., classify) claims under its policies into a certain category so it can track them, assign them to specific claims personnel, and monitor, pay, and otherwise administer them.[6]

55.     Contradicting its current litigation positions, Factory Mutual set up its own claim handling system to contain a loss code specifically for the circumstance that Factory Mutual has argued could not exist—i.e., when "physical loss or damage" and "the associated business interruption" losses covered by its policies are caused by "the actual presence of a communicable disease."

56.     Another document, a May 18, 2020, voicemail message from Factory Mutual Senior General Adjuster (Brian Cook) to another Factory Mutual Senior General Adjuster (John Baker) produced by FM in *Cinemark* also belies its current litigation position. *See* Exhibit 6.

57.     In addressing what position Factory Mutual should take with its policyholders regarding COVID-19 coverage claims, Mr. Cook stated:

> Hey John, this is Brian. Remember we had a discussion about ***changing the words that COVID-19 would not constitute physical loss or damage to something that gives us more wiggle room*** and I would recommend changing the 'would' to 'may not', but give me a call back and see where we are, alright? I got a denial order from Paz and I made that change in his letter and he was questioning it because he used exactly what's [sic] he believes is in the template and still in the template so I'm wondering are we going to change the template to be the softer language or not. So give me a call. Thanks.

Exhibit 6 at 2.

58.     In this voicemail, Cook posits how FM should characterize Coronavirus-related claims in its standard template response letter to its policyholders. *Id.* In an attempt to provide Factory Mutual with "more wiggle room," Mr. Cook proposes that Factory Mutual tell its

---

[6] *Loss Type Codes Overview*, Vertafore,
https://help.vertafore.com/sagitta/content/gettingstarted/personalization/insurance_management_codes/loss_type_codes_overview.htm (last visited June 7, 2023).

13

Case ID: 220602694

policyholders that Coronavirus "may not" constitute physical loss or damage rather than state

unequivocally that it "would not" constitute physical loss or damage. *Id.*

59.     The limited publicly available deposition testimony from FM witnesses taken in

*Cinemark* likewise also belies Factory Mutual's litigation positions. In particular, Cinemark

deposed Factory Mutual's corporate designee, who provided the following testimony regarding

"physical loss or damage:"

> Q: Putting aside Sars-CoV-2 and Covid 19, does FM agree that a virus may cause
> damage to property?
> A: Not viruses that we are aware of at this time. But that's not to say that there
> isn't a virus in the future that cannot cause physical loss or damage to property.
> *See* Excerpt of Transcript of Deposition of Jeffrey Casillas at 297:19-298:1,
> attached hereto as
> Exhibit C.
> Q: So sort of step one, step two, Right? Step one is kind of in the door, physical
> damage, then do any exclusions apply . . . Is that how it works?
> A: Yes.
> Q: Because you wouldn't look to apply an exclusion to damage that's not covered
> in the first place, would you?
> A: Yes.

 *See* Exhibit 7 (Casillas Deposition Transcript) at 301:11-24.

60.     Mr. Cook testified: "Q: But before you even get to the exclusion you need to

determine if there is physical loss or damage, right?" "A: Yes." "Q: So the exclusion excludes certain

types of physical loss or damage, they don't narrow what constitutes physical loss or damage, correct?"

"A: Generally, speaking, yes."  *See* Exhibit 8 (Cook Deposition Transcript) at 44:24-45:9.

61.     Factory Mutual itself also previously affirmatively asserted in court filings that a

mold infestation in the clean room of a laboratory caused physical loss or damage.  In that

context, in direct contravention of its arguments here, Factory Mutual relied upon the impact of a

disease-causing agent (i.e., mold) on the function and utility of the covered property as the basis

for triggering coverage.  Factory Mutual specifically argued in that case (in conflict with its

arguments here), that there was no requirement for structural alteration of the property in order to

14

Case ID: 220602694

trigger coverage.  *See Factory Mut. Ins. Co. v. Federal Ins. Co*., Case No. 1:17-cv-00760 (D.N.M. Nov. 11, 2019), ECF No. 127 (attached hereto as Exhibit 11).  In support of its position in that case, Factory Mutual asserted that "numerous courts have concluded that loss of functionality or reliability under similar circumstances constitutes physical loss or damage," and cited case law as referenced in paragraph 42 above. Exhibit 9, ECF No. 27 at 3.  Factory Mutual affirmatively asserted that another insurer's failure to define "physical loss or damage" made that term "susceptible of more than one reasonable interpretation," rendered the policy "ambiguous," and "must be construed against" that insurer. *Id.*

62.     Also contradicting its current coverage positions, at the outset of the Pandemic, Factory Mutual issued an internal document called "Talking Points on the 2019 Novel Coronavirus (2019-nCov)." Exhibit 10 (the "Talking Points").  Among other things, the Talking Points states that the actual presence of communicable disease at property is a Property Damage "trigger of coverage." *Id.* at 1.  The Talking Points close by noting that the Global Advantage form, on which the Policy is written, "offers some of the broadest property coverage available." *Id.* at 2.[7]

### *The Policy's Coverage Against "Risks of" Pandemic*

63.     The Policy covers not only "physical loss or damage to" property, but also losses resulting from "*all risks of* direct physical loss or damage to property."  The undefined term "risks" in the Policy is defined by many dictionaries to mean "possibility."[8]

---

[7] In apparent anticipation of the multiple claims expected to be filed as a result of the Pandemic, the Talking Points also contradictorily state  that "Civil or Military Authority" coverage and "Contingent Time Element Coverage" coverage do not "apply" because "[t]he presence of a communicable disease does not constitute physical damage" because a "virus" is excluded as "contamination."  *Id.* at 2.  Those contradictory statements are false and are belied by Factory Mutual's many prior admissions.

[8] *See, e.g.*, *Risk*, Merriam-Webster, www.merriam-webster.com/dictionary/risk ("possibility of loss or injury"); *Risk*, Collins Dictionary, www.collinsdictionary.com/us/dictionary/english/risk (synonymous with "danger, chance,

Case ID: 220602694

64.     By its express terms, the Policy therefore insures against losses caused by "risks," such as, threats or the possibility of physical loss or damage to property, as well against losses once such physical loss or damage to property has occurred.

65.     Factory Mutual chose to utilize this broad "all risks" language, instead of more restrictive policy language drafted in 2013 by the Insurance Services Office ("ISO"), the leading insurance industry drafting organization, and utilized by various insurers since that time.

66.     Prior to 2013, ISO's standard "Businessowners Coverage Form" such as ISO form BP 00 03 01 10, defined "Covered Causes of Loss" as "[r]isks of direct physical loss unless the loss is…[e]xcluded…or [l]imited…."  *See* Exhibit 11.  In 2013, ISO issued revised Businessowners coverage forms, such as ISO form BP 00 03 07 13, which redefined "Covered Cause of Loss," by removing the term "risks of."  ISO now defines "Covered Causes of Loss" as "[d]irect physical loss unless the loss is excluded or limited…."  *See* Exhibit 12.

67.     ISO issued a "Notice to Policyholders" that insurers using the form could issue to its insureds to explain the changes in policy wording.  The notice expressly states that "the term 'risk of' is removed from the Covered Cause of Loss provision."  *See* Exhibit 13.

68.     Accordingly, since at least 2013, insurers have had the opportunity to incorporate, and have incorporated, an insuring agreement that deletes any reference to covering losses created by the "risks of" insured perils.   For example, Cincinnati Insurance Company, in revising its standard property policy form number FM 101, issued a "Notice to Policyholders" in 2016 stating, "As ISO has done in reaction to court decisions, we are deleting the word 'Risks' from the preamble to the Covered Causes of Loss section of FM 101."  *See* Exhibit 14.

---

threat, possibility"); *Risk*, Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/risk ("the possibility of something bad happening"); *Risk*, The American Heritage Dictionary of the English Language, https://www.ahdictionary.com/word/search.html?q=risk ("The possibility of suffering harm or loss; danger").

16

Case ID: 220602694

69.     Upon information and belief, ISO's rationale for removing the term "risk of" from its standard businessowners property policy turned upon the insurance industry's awareness that courts had repeatedly interpreted the term "risk of" to include the "threat of" loss or damage. Such cases include *401 Fourth St., Inc. v. Inv'rs. Ins. Grp.*, 879 A.2d 166, 169-70 (Pa. 2005) (policy language covering "risks of" direct physical loss involving collapse necessarily contemplates broader coverage than language simply insuring against "collapse."), and *Customized Distrib. Servs. v. Zurich Ins. Co.*, 862 A.2d 560, 564-65 (N.J. Super. Ct. App. Div. 2004) ("the term 'risk' in the provision 'RISK[ ] OF DIRECT, PHYSICAL LOSS" supports the view that the policy does not require that there be any actual physical damage to or alteration of the material composition of the property").

70.     Indeed, in contemporaneous documents prepared by ISO when it revised its language, ISO cited to the Pennsylvania Supreme Court's opinion in *401 Fourth Street* as support for its position that the "risks of" language is being interpreted broadly by the courts.  Exhibit 15. ISO relied upon that case as a reason to change its current form even though it acknowledged that the language in the policy at issue in *401 Fourth Street* was different than that used in the ISO form, suggesting that the court decision was of concern and created an potential interpretive problem for insurers, regardless.

71.     In 2008, before this Pandemic, Donald S. Malecki, an insurance expert, who was an underwriter for a number of insurance companies, authored a number of insurance-industry sponsored treatises and served on a prominent ISO advisory panel, published an article in *Risk Management* magazine stating that a purchaser of insurance may understand the phrase "risks of direct physical loss" to mean a threat of loss, citing *Customized Distribution* and other similar cases.  Exhibit 16.

Case ID: 220602694

72.     In the article, Malecki concluded:  "Considering cases like these, where courts hold that 'risks of direct physical loss or damage' or 'risks of physical loss or damage' do not require that there be any actual physical damage but simply the threat of physical damage, there soon may be impetus for some subtle policy changes.  Instead of referring to 'risks of direct physical loss,' it may be better for insurers to amend their policies to state that the coverage applies to direct physical loss or damage to covered property from a covered cause (or all covered causes), not hereinafter excluded or limited.  (***Some insurers have already taken similar precautions, with some even going so far as to avoid reference to 'physical loss or damage' because of its potential for ambiguity.***)" (Emphasis added).

73.     Upon information and belief, Factory Mutual has at all relevant times been aware of the recommendation made by Malecki and the case law Malecki cited.

74.     Factory Mutual nonetheless chose not to remove the term "risks of" from the insuring agreement in the Policy that it sold to the Flyers for a very substantial premium.  The Flyers have faced the imminent "risk"/threat of physical loss or damage to their property covered by the Policy because of the Pandemic.  As a result of Factory Mutual's use of the "risks of" language in its Policy (and also due to the fact that the Third Circuit in *Port Authority* recognized that actual damage is not required to trigger coverage, but a "threat" is enough), it is not necessary in order to trigger coverage under Factory Mutual's policy for the Insured to prove the actual presence of Coronavirus on its premises; the threat of its presence and a resulting harm to human health is sufficient to trigger Factory Mutual's coverage.  The Insured will prove this threat through experts and other evidence during the pendency of this litigation.

18

Case ID: 220602694

### *The Policy's "Additional Coverages" for "Communicable Disease"*

75.     The Policy provides various coverages, including coverage extensions/ additional coverages, that are not mutually exclusive, except where the Policy explicitly so states.  In the instances where Factory Mutual intended a coverage extension to be the sole available coverage for a particular type of loss, Factory Mutual included policy language expressly stating this limitation.

76.     For example, the Policy covers as an "Additional Coverage" "Data, Programs or Software" coverage.  In that coverage grant, Factory Mutual expressly states that the "Costs recoverable under this Additional Coverage are *excluded from coverage elsewhere in this Policy*." Exhibit 1, Property Damage form at p. 17-18 (emphasis added).

77.     With respect to its Additional Coverages for Communicable Disease, Factory Mutual did not include any such language that stated that these coverages were the only coverages under the Policy that applied to Communicable Disease (as that phrase is defined by Factory Mutual in its Policy), or that broader Communicable Disease coverage was otherwise excluded by the Policy.

78.     The Policy's "Communicable Disease Coverages," grant "Additional Coverage" for "Communicable Disease Response" and "Interruption by Communicable Disease," and limit these coverages to $1,000,000.  These are narrow coverages that apply when Communicable Disease (again, as defined in the Policy) is actually present at a property and does not involve circumstances where the Policy's full policy limits ordinarily would be triggered—where Communicable disease involves or creates "direct physical loss or damage," including a threat of such physical loss or damage.  In other words, regardless of whether Communicable Disease is actually present, if it is suspected or threatened to be present and that threatened presence could

19

Case ID: 220602694

create a significant health hazard to people occupying the premises impairing the property's function or utility, actual or threatened "physical loss or damage" would be involved and the Policy's full limit applies.  The Communicable Disease Coverages thus provide "Additional Coverage" in the circumstance where the Policy's traditional coverage trigger is not met.

79.     With respect to "Communicable Disease Response," the Policy grants "Additional Coverage" for up to $1,000,000 in insurance for clean-up, removal, disposal and reputation management public relations costs where the "actual" presence of communicable disease is involved at a covered location and access is "limited, restricted or prohibited" by an order of an authorized governmental regulatory agency or a decision of an Officer of the Flyers.  Exhibit 1, Property Damage form at p. 22.

80.     For "Interruption by Communicable Disease," the Policy grants corresponding coverage for the short-term business-interruption loss under the same specified circumstances as the "Communicable Disease Response" coverage section.  As one of the "Additional Time Element Coverage Extensions," "the "Interruption by Communicable Disease" section provides coverage of up to $1,000,000 for the Flyers' "Actual Loss Sustained and EXTRA EXPENSE," where the "actual" presence of communicable disease is involved at a covered location and access is "limited, restricted or prohibited" by an order of an authorized governmental regulatory agency or a decision by an Officer of the Flyers.  Exhibit 1, Time Element form at p. 56.  In direct contrast to the "Data, Programs or Software" additional coverage section, which, as noted above, expressly states that amounts recoverable under that additional coverage "are excluded from coverage elsewhere in [the] Policy," the "Interruption by Communicable Disease" section states that the insurance provided is "part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section," thereby confirming that

Case ID: 220602694

such coverage is available *concurrently* with *any other* Time Element coverage that may apply. Exhibit 1, Time Element form at p. 57 (emphasis added).

81.     As set forth above, the coverage provided by the Policy's Communicable Disease Coverages is triggered when (1) "communicable disease" is actually present at an insured location, and (2) access to that facility is "limited, restricted or prohibited" by the "decision of an Officer" of the Flyers "as a result of such presence of communicable disease." If these two predicates are satisfied, then the Policy covers (1) the "[c]leanup, removal and disposal of such presence of communicable disease" from the Flyers' facilities together with the costs or fees for reputation management, and (2) the business interruption coverage loss, up to the applicable sublimit. On their face, the Policy's Communicable Disease Additional Coverages do not require "physical loss or damage" to apply. However, if communicable disease also involves actual or threatened "physical loss or damage," then other Factory Mutual coverages (and policy limits) can be triggered.

82.     Thus, where the insured suffers loss as a result of the presence of communicable disease causing physical loss or damage, both the "Interruption by Communicable Disease" coverage (which does not require physical damage to property as a predicate to coverage) and the broad "Time Element" coverage involving actual or threatened physical loss or damage are triggered. In such instances, the full $100 million Time Element per-occurrence limit applies.

### *Factory Mutual's Contamination Exclusion*

83.     The Policy's contamination exclusion ("Contamination Exclusion") provides:

> This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:
>
> 1) **contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy. If **contamination** due only to the actual not suspected presence

21

of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.

84.     A "**contaminant**" is defined as "anything that causes "**contamination**" and "**contamination**" is defined as:

any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew.

85.     Upon information and belief, Factory Mutual contends that the Contamination Exclusion precludes coverage for the Flyers' claim, and that the exclusion applies to communicable disease that involves actual or threatened physical loss or damage, but not the sub-limited Communicable Disease Additional Coverages.  According to Factory Mutual, those coverages are "exempted" from the exclusion.  Factory Mutual is wrong.  On the face of the Policy and in light of Factory Mutual's representations to state insurance regulators when it added the term "virus" to its policy definition of "contamination," its contamination exclusion applies narrowly to virus in the pollution context (such as medical waste dumped in a landfill) and not broadly to human spread infectious disease.  In other words, whatever the Contamination exclusion means, and more precisely, whatever the term "virus" means as used in the exclusion, it cannot mean the etiological cause of Communicable Disease, a covered cause of loss.  This is so because if it did, then under Factory Mutual's interpretation, the exclusion would apply not just to the Policy's traditional coverages, but also to its Communicable Disease Additional Coverages, rendering those coverages meaningless as a result of being excluded by the Policy.

22

86.     Upon information and belief, Factory Mutual fixates on the word "virus" and says that since COVID-19, a Communicable Disease, is caused by SARS-CoV-2, a virus, the physical loss and damage it causes must be excluded.  This is not correct.

87.     The Policy contains an express definition for "communicable disease" which is:

> disease which is:
> A.  transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or
> B.  Legionellosis.

Exhibit 1 at General Provisions 13 (Definitions), p. 67-68.

88.     The defined term "communicable disease" is not included in the Policy's definition of "contamination." And, while Factory Mutual included within the "contamination" definition the terms "pathogen," "pathogenic organism," "virus," and "disease causing or illness causing agent," Factory Mutual did not use those terms in its definition of "communicable disease."  Based upon information and belief, the Flyers allege that Factory Mutual thus did not intend to include "communicable disease" as an excluded "contaminant" under the Policy.

89.     In fact, were "communicable disease" interpreted to be included within "contamination," then the sub-limited Communicable Disease Additional Coverage would have no value because the coverage would be expressly excluded. As a result, Contamination (as used in the Policy) cannot mean Communicable Disease (as defined in the Policy) and the exclusion therefore cannot reasonably be interpreted to exclude the Flyers' loss (which is the direct result of a Communicable Disease).

90.     Understanding the policy interpretation problem created by Factory Mutual's effort to expand its Contamination exclusion to include pandemic-related loss, Factory Mutual has stated in other similar litigation that its Communicable Disease Additional Coverages are "exceptions" to its Contamination exclusion. In other words, according to Factory Mutual, the

23

Case ID: 220602694

Contamination exclusion excludes loss and damage from Communicable Disease, with an exception for the Communicable Disease Additional Coverages. While Factory Mutual may argue that now to overcome an insurmountable hurdle to applying its Contamination exclusion, nowhere in its Policy (which is what governs) does Factory Mutual state that these coverages are so excepted.

91.     First, both Communicable Disease Additional Coverages are expressly "subject to the Policy provisions, including applicable exclusions . . . ." Exhibit 1, Property Damage form at p. 17.

92.     Second, the Contamination exclusion does contain an express exception, **but only** for radioactive contamination, not for the Communicable Disease Additional Coverages. Exhibit 1, Property Damage form at p. 14, Exclusion D.1 ("This exclusion D1 does not apply to radioactive contamination which is excluded elsewhere in this Policy.")

93.     Third, in other exclusions, Factory Mutual also includes express exceptions.  *See, e.g.,* Exclusion A.6. (exception for DECONTAMINATION COSTS and LAW AND ORDINANCE coverages); B.4. (exception for SERVICE INTERRUPTION and OFF PREMISES DATA SERVICES coverages), but again does not do so with respect to its Communicable Disease Additional Coverages. In other words, when it wanted to, Factory Mutual provided for exceptions to its exclusions right in the exclusions themselves. It did not do so with respect to the Communicable Disease Additional Coverages in the Contamination exclusion (or anywhere else in the Policy).

94.     As a result, the only interpretation of "virus" and related terms used by Factory Mutual in its Contamination exclusion that gives meaning to all coverages, including the Communicable Disease coverages (particularly because Factory Mutual did not include the

24

Case ID: 220602694

defined phrase "communicable disease" in its Contamination exclusion) is to treat "virus" as used in the Contamination exclusions as involving traditional environmental pollution, not diseases that are transmitted between humans.

95.     Factory Mutual's statements to state regulators in 2006 confirm the reasonableness of such an interpretation.  Prior to 2006, the "contamination" exclusion in Factory Mutual's standard property policy was expressly limited to traditional pollution.  Specifically, the standard policy excluded "contamination including but not limited to the presence of pollution or hazardous material."  *See* Exhibit 17, Explanatory Memorandum accompanying Filing FMIC-2006-5, at p. 21 of 35.

96.     On information and belief in or around August, 2006, Factory Mutual sought approval from state insurance regulators in a "nationwide submission done simultaneously," to sell a revised property policy form that includes the language contained in the Contamination exclusion that Factory Mutual used in the Flyers' Policy.  Factory Mutual advised the state regulators approving the form that there was "no change in coverage" from the previous pollution-only exclusion.  In its Explanatory Memorandum accompanying Filing FMIC-2006-5, Factory Mutual explained that the contamination exclusion was:

> editorially revised to accentuate what is meant by contamination.  ***No coverage change***.
> Note that the introductory wording (page 20 in Comparison) to the exclusion has not been
> amended, and contamination which directly results from other physical damage not
> excluded by this policy is still covered.  No coverage change.

 Exhibit 17, Explanatory Memorandum at p. 2 of 3 (emphasis added).

97.     On information and belief, Factory Mutual submitted Filing FMIC-2006-5 in all states where it proposed to sell its revised form, including in Pennsylvania.   In its correspondence Factory Mutual advised the regulators that "This is a nationwide submission done simultaneously."  Exhibit 17 at p. 1.

25

Case ID: 220602694

98.     Factory Mutual thus expressly advised insurance regulators including in Pennsylvania that its Contamination exclusion did not reduce coverage to consumers as compared to its 2006 form containing a pollution-only exclusion. Despite its statements to regulators, Factory Mutual now alleges that its exclusion applies much more broadly than to "pollution and hazardous material" and that it is also a pandemic exclusion. The Flyers have not yet had the opportunity to conduct discovery of Factory Mutual to ascertain what additional information it may possess in its files and through its witnesses regarding the meaning and expanse of its Contamination exclusion, particularly in light of the sub-limited Communicable Disease Additional Coverages and that Factory Mutual chose not to except from its Contamination exclusion the Communicable Disease Additional Coverages.

99.     The Flyers thus allege that the only interpretation of the Contamination exclusion that gives meaning to all policy terms, and is consistent with Factory Mutual's representations to state insurance regulators is that "virus" and other related terms contained in Factory Mutual's Contamination exclusion applies to pollution and hazardous material-related virus, and not virus that is transmitted between humans, such as the Coronavirus.

100.    To the extent Coronavirus was/is actually present or at risk of being present at an Flyers property, its presence would be the result of a natural process, as opposed to conduct causing pollution or contamination. The Flyers reasonably expected and understood that a Contamination exclusion would apply to polluting activities, as opposed to natural catastrophes such as the Coronavirus Pandemic.

101.    Moreover, had Factory Mutual wished to exclude losses resulting from a pandemic, it should and could have created a separate, clear exclusion for such losses.

Case ID: 220602694

102.    Indeed, the language of the so-called Contamination Exclusion stands in stark contrast to the language of the Insurance Services Office's ("ISO") "virus or bacteria" exclusion referenced *supra*, which ISO confirmed in contemporaneous documents was intended to address pandemic. Had Factory Mutual wished to exclude coverage for losses resulting from a pandemic or other human-transmitted disease from its Policy, it could have incorporated into the Policy a specific exclusion (such as a pandemic exclusion). At the very least, discovery is necessary to determine why Factory Mutual did not, so that all parties and the Court can evaluate Factory Mutual's coverage based upon a fulsome record.

103.    The Flyers also allege that the Contamination Exclusion does not apply because, among other reasons, it excludes only contamination and associated "direct" "costs," not "loss" or "damage," or even indirect "costs," such as time element loss and extra expenses.

**THE INSURANCE INDUSTRY AND FACTORY MUTUAL
SPECIFICALLY KNEW OF THE RISKS AND DANGERS OF THE PANDEMIC**

104.    Insurers, such as Factory Mutual, were repeatedly warned, and have been aware for years, of the potential impact of pandemics. In fact, there were many publicly available reports about the risk of pandemics – and what insurers should do in response to those risks – in the months and years before the Pandemic.  For example:

    a.   One article noted in March 2018: "Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community. In addition, indirect losses would be severe, most notably on the asset side of the balance sheet."[9]

    b.   The Insurance Library Association of Boston (founded 1887) lists on its website at least 15 articles, reports, and white papers available to insurers from early 2007 through 2018.[10]  The Association states on its website: "The past 20 years

---

[9] *See* "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/ (last visited May 10, 2023).

[10] *See* https://insurancelibrary.org/2020/02/07/pandemics-and-insurance/ (last visited May 10, 2023).

27

Case ID: 220602694

has seen the rise of a number of pandemics…. We thought it might be apt for us to take a look back and see what the insurance industry has learned as well." The webpage then lists various articles and reports discussing the risks and impacts of pandemics on the insurance industry.  For example, an article stated in 2014 that pandemics "can have a significant impact on life and health insurance portfolios, and, depending on contract terms, could also affect other lines such as workers' compensation, business interruption, travel and event cancellation and disability insurance."[11]

105.     In 2005, in response to the 2003 outbreak of SARS, the Insurance Services Office (ISO) decided against modifying a "contamination" exclusion to exclude virus from the standard property policy but rather decided to proceed with a standalone "Exclusion of Loss Due to Virus or Bacteria."

106.     Loretta Newman, who participated in leading ISO in its 2006 approach to biological contamination wrote in an internal email on April 18, 2006 that ISO would not use a contamination exclusion to exclude coverage for viruses: "Please do not use this [contamination exclusion] draft.  We are not going forward with it for Commercial Property. Instead we're working on a virus/bacteria exclusion for accelerated filing action."[12]

107.     In 2006, ISO considered the need to draft an exclusion that would bar coverage for losses caused by a virus, and in July 2006 ISO prepared a circular as part of its filing with state insurance regulators of a standard exclusion of loss due to human disease-causing viruses and bacteria.  In that circular, ISO cited "rotavirus, SARS, [and] influenza" and observed that "[t]he universe of disease-causing organisms is always in evolution."  Exhibit 18.

---

[11] *See* Nita Madhav, "Travel Sickness: Pandemic Risk Models Show Diseases Move More Quickly and with Greater Impact in our Connected World," *Best's Review*, 115 no. 8 (Dec. 1, 2014).

[12] Exhibit 3, Sagalow Certification at ¶ 78.

Case ID: 220602694

108.    ISO's circular further recognized that "Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property."

109.    ISO also expressly warned of a need for its exclusion because "the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing [property] policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent."

110.    With its circular, ISO thus acknowledged that (i) the presence of a human disease causing virus could give rise to physical loss or damage to property; (ii) such damage could trigger coverage under property policies for property losses, including business interruption losses; and (iii) absent addition of ISO's exclusion, the existing language in property policies, like that issued by Factory Mutual here, did not clearly and unambiguously bar coverage for such losses.

111.    ISO therefore introduced with its circular a standard-form exclusion that it entitled "Exclusion Of Loss Due To Virus Or Bacteria" (form CP 01 40 07 06 and, in certain jurisdictions, form CP 01 75 07 06).  As noted in the circular, the purpose of this standard form language was to allow those insurers that chose to use it in their insurance policies, to attempt to protect themselves from coverage for loss or damage resulting from infectious material and pandemic.

112.    Accordingly, since 2006 insurers have had the opportunity to incorporate, and have incorporated, this standard virus exclusion in certain of their policies in an effort to avoid covering loss due to a disease such as COVID-19.

Case ID: 220602694

113.     Factory Mutual nonetheless chose to not include the ISO or other more express pandemic or similar exclusion(s) in the Policy.

**THE PANDEMIC**

114.     On March 11, 2020, the WHO declared the Coronavirus outbreak a worldwide pandemic[13] and noted its deep concern "by the alarming levels of spread and severity [of the Coronavirus]." According to numerous public health authorities, everyone is at risk of exposure to Coronavirus and falling ill with COVID-19.  Due to its highly contagious and easily transmitted nature, a single instance of Coronavirus in a community can (and as time has progressed, does) quickly and exponentially grow into a massive, uncontainable outbreak.

115.     Coronavirus rapidly spread and continues to spread throughout the United States and the world.  It is present in fluid particles in the air, as well as on surfaces (*e.g.*, walls, chairs, doors, fixtures, countertops and touch screens).  It is highly contagious and easily transmitted from person to person, from airspace to person, or from surface to person.

116.     Coronavirus has several modes of transmission.  According to the WHO and the Centers for Disease Control and Prevention ("CDC"), Coronavirus can spread from person to person through physical droplets from the nose or mouth that are spread when an infected person sneezes, coughs or exhales.  The physical droplets then remain in and contaminate the air, and also land on and contaminate nearby objects and surfaces, where Coronavirus remains active and dangerous (even while in the air and on inert objects and surfaces) for long periods of time.

---

[13] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited May 10, 2023).

Case ID: 220602694

117.   Coronavirus spread widely in this manner, in Pennsylvania and nationwide, including through interactions with physical property inside premises, and encounters with airborne particles within premises.

118.   Importantly, even asymptomatic infected persons (*i.e.*, those who have no sign of illness) can and did spread Coronavirus.[14]  In 2020, studies estimated that over 40% of infected individuals may never develop symptoms, yet still spread Coronavirus through physical droplets.[15]

119.   Respiratory droplets expelled from infected individuals remain in the air, and land on, attach, and adhere to surfaces and objects.  In doing so, they physically change the airspace of the relevant premises and the property and its surface by becoming a part of that surface.  As a result of this physical alteration, contact with that previously safe, airspace, as well as inert surfaces (*e.g.,* walls, tables, countertops) has been made unsafe.

120.   The consensus among researchers, the CDC and WHO is that a predominant mode of transmission of Coronavirus and/or COVID-19 is through the air.[16]  Scientists have

---

[14] *See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last visited May 10, 2023).

[15] *See, e.g.* Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected* (May 27, 2020, 1:43 PM), https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-maybe-more-common-suspected-n1215481 (last visited May 10, 2023).

[16] Jason Gale, *Covid-19 Is Airborne, Scientists Say. Now Authorities Think So, Too,* Bloomberg (May 16, 2021), https://www.bloomberg.com/news/articles/2021-05-16/covid-is-airborne-scientists-say-now-authorities-think-so-too (last visited May 10, 2023).

31

Case ID: 220602694

confirmed that infections can be prevented through improved ventilation and better indoor air quality guidelines to cover airborne pathogens.[17]

121.    The CDC updated its guidance as of May 7, 2021 to reflect that exposure occurs through "inhalation of very fine respiratory droplets and aerosol particles" in addition to "deposition of respiratory droplets and particles on exposed mucous membranes in the mouth, nose, or eye by direct splashes and sprays," and "touching mucous membranes with hands that have been soiled either directly by virus-containing respiratory fluids or indirectly by touching surfaces with virus on them."[18]

122.    The physical effects of the Coronavirus and/or Pandemic are not something that one can determine by glancing at the air, a door handle or a light switch and deciding that they look undamaged. Instead, those physical effects are established through factual and expert investigation, studies, and evidence, including through testimony by experts in the field of, for example, epidemiology and virology.

123.    As Factory Mutual is aware, experts have already opined in other similar matters as to the precise mechanism by which such damage occurs.  In litigation pending in the Nevada federal court against its sister company, styled *Treasure Island LLC v. Affiliated FM Ins. Co.*, No. 2:20-cv-00965-JC-EJY (D. Nev.), the insured's virology expert, Dr. Angela Rasmussen, opined as follows in her November 6, 2020 initial report (*see* Exhibit 19 attached hereto, as attached to

---

[17] *Id.*

[18] *Scientific Brief: SARS-CoV-2 Transmission,* CDC (updates as of May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html#:~:text=References-,SARS%2DCoV%2D2%20is%20transmitted%20by%20exposure%20to%20infectious%20respiratory,respiratory%20fluids%20carrying%20infectious%20virus (last visited December 14, 2021).

32

Case ID: 220602694

the complaint in the action styled *Cinemark Holdings, Inc. v. Factory Mut. Ins. Co*, No. 4:21-cv-

00011 (E.D. Tex.)):

  a. "COVID-19 is a communicable disease that impacts and physically damages Treasure Island's property in the following way: persons on site with COVID-19 shed the SARS-CoV-2 virus into the air and surfaces at Treasure Island. This results in tangible, demonstrable, and detectable physical alternation and transformation to the air and surfaces rendering them dangerous transmission vehicles for the potentially deadly disease."

  b. "The impact and physical damage caused by persons with COVID-19 is not temporary and is sustained through any occupation of the property. Because COVID-19 is an infectious viral disease that can be transmitted to susceptible people, it causes additive, sustained property damage. A substantial amount of transmission is prior to onset of clinical symptoms, which makes it difficult to detect. Due to the size of the property at Treasure Island, cleaning and disinfection alone are insufficient to remediate the damage."

124.      In the same case, the insured's epidemiology expert, Dr. Alex LeBeau, opined in

his November 6, 2020 initial report (*see* Exhibit 20 attached hereto, as attached to the complaint

in the action styled *Cinemark Holdings, Inc. v. Factory Mutual Ins. Co*, No. 4:21-cv-00011 (E.D.

Tex.)) as follows: "Individuals with COVID-19 at Treasure Island altered the physical

characteristics of surfaces and the air of occupied spaces at the location and at facilities in the

vicinity with respiratory secretions and aerosols. As a result, the surfaces and air of occupied

spaces at Treasure Island became vehicles for COVID-19 transmission."

125.      The damage to property caused by persons with COVID-19 is not limited to the

duration that infection from a single source remains present.  A recurrent cycle of infection via the

air, infectious surfaces, and contact between an infected person and others will further damage

property, thus resulting in sustained property damage.

126.      At the time Factory Mutual evaluated Comcast Spectacor's claim for coverage,

numerous scientific studies had documented that Coronavirus can physically remain in and alter a

premises' airspace and property for extended periods of time.  For example, a peer-reviewed

Case ID: 220602694

article published in *Virology Journal* on October 7, 2020 found that Coronavirus can survive on surfaces for ***up to 28 days*** at ambient temperature and humidity (20 °C [68 °F] and 50% RH).[19]

127.     Mere cleaning and disinfecting of the property and the air does not repair or remediate the actual physical and tangible alteration to property caused by Coronavirus and/or COVID-19, nor does it transform the property from its unsafe, hazardous and potentially deadly condition.

128.     A number of studies have demonstrated that Coronavirus is "much more resilient to cleaning than other respiratory viruses so tested."[20]  The measures that must be taken to remove Coronavirus from property are significant and go far beyond ordinary or routine cleaning.  A study by the Northwell Health System concluded that even the decontamination procedures recommended by the WHO for intensive-care units were not effective at removing SARS-CoV-2, and in particular were ineffective against aerosolized particles.[21]

129.     Efficacy of decontaminating agents for viruses is based on a number of factors, including the initial amount of virus present, contact time with the decontaminating agent, dilution, temperature, and pH, among many others.  Detergent surfactants are not recommended as single agents, but rather in conjunction with complex disinfectant solutions.[22]  Studies of

---

[19] *See* S. Riddell, *et al., The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 Virology J., Art. No. 145 (2020), *available at* https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited May 10, 2023).

[20] Nevio Cimolai, *Environmental and decontamination issues for human coronaviruses and their potential surrogates*, 92 J. MED. VIROLOGY 11, 2498-510 (June 12, 2020), https://doi.org/10.1002/jmv.26170 (last visited May 10, 2023).

[21] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7967612/ (last visited May 10, 2023).

[22] *Id.*

34

Case ID: 220602694

coronaviruses have demonstrated viral RNA persistence on objects despite cleaning with 70% alcohol.[23]

130.    Additionally, it can be challenging to accurately determine the efficacy of decontaminating agents.  The toxicity of an agent may inhibit the growth of cells used to determine the presence of virus, making it difficult to determine if lower levels of infectious virus are actually still present on treated surfaces.[24]

131.    Critically, cleaning surfaces will not remove the aerosolized Coronavirus particles from the air that can be inhaled and cause people to develop COVID-19[25]—no more than cleaning friable asbestos particles that have landed on a surface from that surface will remove the friable asbestos particles suspended in the air that people can inhale and develop asbestos-related diseases.  Nor will routine cleaning prevent an infected person from entering the property and exhaling Coronavirus particles and virions into the air and surrounding environment.  What was and is necessary to repair airspace and surfaces within a premises to address the dangers of spread of Coronavirus requires factual and expert input and analysis.

132.    In *Treasure Island, LLC v. Affiliate FM Insurance Co.*, epidemiology expert Joseph Lewnard, Ph.D. explained that to entirely clean the insured property would take

> a minimum of 24 or 48 hours, during which time functions would need to be suspended to allow cleaning to take place. Assuming a 48-hour cleaning, we see that even at the lowest background prevalence considered (0.1%), re-introduction would be expected before cleaning could be completed in over one half of instances; with a 24-hour cleaning, re-introduction would be expected before cleaning could be completed in roughly one in three instances.... [The insured]

---

[23] Joon Young Song et al., *Viral Shedding and Environmental Cleaning in Middle East Respiratory Syndrome Coronavirus Infection*, 47 INFECTION & CHEMOTHERAPY 4, 254-55 (Dec. 2015), https://www.icjournal.org/DOIx.php?id=10.3947/ic.2015.47.4.252 (last visited May 10, 2023).

[24] *Id.*

[25] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7967612/ (last visited May 10, 2023).

Case ID: 220602694

would, in effect, need to remain continuously closed in order to address
introductions of COVID-19 at the rate they would be expected to occur.

Exhibit 21 ("Lewnard Report") ECF No. 205-3 at 131.

133.    The amicus brief of the Maryland State Medical Society (MedChi) filed in the

case of *Tapestry, Inc. v. Factory Mutual Ins. Co.,* Misc. No. 1 (Md. S. Ct.) sets forth a number of

additional studies regarding the transmission of COVID-19 through the air, the continual intrusion

of the COVID-19 virus on property by continuous reintroduction; and the inability of removal of

the COVID-19 to be removed or eliminated with routine cleaning.  Exhibit 22.

134.    Accordingly, because an individual with no symptoms can spread Coronavirus

simply by breathing or talking (and certainly by yelling and screaming for their team at a Flyers

hockey game), and because droplets containing Coronavirus can remain in the air and land and

remain infectious on surfaces for substantial time, ***the risks*** posed by Coronavirus are not

temporary.  Even if the air and surfaces at a covered premises can be thoroughly and effectively

cleaned, each time an infected person enters that space the cycle renews such that infectious

Coronavirus is likely (if not certain) to be present wherever people are located or congregate,

particularly if they are congregated as would be intended for the Flyers' premises to be used for

their intended function.  The world has seen communities shut down and reopen, only to be shut

down again following another outbreak.  Until the advent and administration of COVID-19

vaccines to people across the country and world, the risk of spread of Coronavirus in an

environment such as the Flyers' premises when used for their intended function was a near

certainty, particularly when the people are gathered in packed and raucous screaming crowds at a

indoor arena to cheer on their teams.  The virtually guaranteed risk of significant harm and

damage to persons and property (including its airspace), and in particular in a location such as the

Flyers' arena, prior to the widespread administration of the vaccine, is why it became necessary to

36

Case ID: 220602694

close or strictly limit the use of the Flyers' premises; and it is why in some instances those closures and restrictions continued to remain necessary for a wholly unforeseen and extended period.  This chain of events created great risk to the Flyers of physical loss or damage to covered property, in addition to actual physical loss or damage to property.

135.     Owing to the Coronavirus' contagiousness and pervasiveness once the Pandemic began, it was statistically certain that many individuals in or around commercial properties where people congregate had been exposed to the Coronavirus and were carrying the virus.  Statistical modeling confirms to a high degree of certainty that the Coronavirus was imminently present or actually present in or around such commercial properties, including insured premises.[26]  After the Pandemic began, it also was statistically certain that the Coronavirus was being dispersed continuously into the air and on property in or around such premises.

136.     Once the Pandemic began in the United States, COVID-19 positivity rates revealed by the commercially available testing initially available demonstrated the pervasiveness of the Coronavirus in or around such premises.[27]

137.     Epidemiologists have explained that "the percent positive is a critical measure because it gives us in indication of how widespread infection is in the area where the testing is occurring[.]"[28]  It is a crucial indicator of whether a business can safely remain open.  As a

---

[26] *See, e.g.*, Exhibit 21, Lewnard Report, ECF No. 205-3 at 126-128; *Covid-19 Projections*, IHME https://covid19.healthdata.org/united-states-of-america?view=total-deaths&tab=trend; *LANL Covid-19 Cases and Deaths Forecasts,* LOS ALAMOS NATIONAL LABORATORY, https://covid-19.bsvgateway.org

[27] *See, e.g.*, Aroon Chande et al., *Real-time, interactive website for US-county-level COVID-19 event risk assessment*, 4 NATURE HUM. BEHAV. 1313-19 (Nov. 9, 2020), https://doi.org/10.1038/s41562-020-01000-9 (last visited May 10, 2023)

[28] David Dowdy & Gypsyamber D'Souza, *COVID-19 Testing: Understanding the "Percent Positive,"* JOHNS HOPKINS (Aug. 10, 2020), https://www.jhsph.edu/covid-19/articles/covid-19-testing-understanding-the-percent-positive.html (last visited May 10, 2023)

Case ID: 220602694

threshold for the percent positive being "too high," the WHO stated that the percent positive should remain below 5% for at least two weeks before re-opening.[29]

138.    Once the Pandemic began in the United States, the Commonwealth of Pennsylvania and City of Philadelphia began experiencing exceptionally high positivity rates far exceeding this CDC-standard.  As of May 15, 2020, the positivity rate in Philadelphia was approximately 13%.[30]

139.    In addition, owing to the absence of commercially-available tests for surface and aerosol presence of the Coronavirus and the shortage of testing kits for humans at the time the Pandemic began in the United States, positive test results did not and could not provide sufficient means for ascertaining the full presence of the Coronavirus in or around commercial properties, including insured premises.

140.    The actual and/or threatened presence of Coronavirus particles at the Flyers' and other covered premises rendered physical property within the premises damaged, unusable, uninhabitable, unfit for intended function, dangerous, and unsafe.  It impaired and diminished the value, utility and normal function of the premises (including the airspace and physical property contained within).  Similarly, the presence at the Flyers' and other covered premises of individuals infected with Coronavirus, or carrying Coronavirus particles on their body (including their clothing and any other objects on their body), rendered and/or created the risk of the premises, including the airspace within those premises unusable for their intended function, damaged and unsafe.  These circumstances caused and/or created the risk of physical loss and damage to the covered premises and property. And, as to premises where Coronavirus was not in

---

[29] *Id.*

[30] *Philly COVID positive rate worse than other big U.S. cities, cases surge past spring peak,* available at https://billypenn.com/2020/11/15/philly-covid-restrictions-surge-worse-other-cities-spring-peak/

Case ID: 220602694

fact specifically identified, given the nature of the disease, the risk of such consequences was near certain, if not certain.

141.     The Policy expressly insures against the "risks" of Coronavirus, and the Coronavirus rendered the insured's properties, among other things, unusable, damaged, unsafe or not able to be used for their full and intended functions.

142.     In just three years, COVID-19 killed more than 1.1 million Americans.[31]  Plaintiff rejects, especially in 2020 before the availability of vaccines, any suggestion that Coronavirus is less dangerous or renders property less hazardous than asbestos, which various experts estimate causes on average between 2,500[32] and 15,000[33] per year in the United States.

### THE FLYER'S COVERAGE CLAIM AND
### FACTORY MUTUAL'S BREACH OF THE POLICY

143.     The Flyers timely reported their losses to Factory Mutual under the Policy.

144.     In recognition of the actual presence of "communicable disease" at the insured premises, Factory Mutual paid $1 million in Communicable Disease coverage.  There is no dispute in this case that the COVID-19 virus was actually present at the insured premises.

145.     However, Factory Mutual has failed to acknowledge coverage under the Policy beyond the limited Communicable Disease coverage.  Factory Mutual has not paid the Flyers' full loss that is covered by other Policy coverages, including Time Element.

---

[31] Covid Data Tracker, CDC.gov, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited May 10, 2023).

[32] Linda Molonari, *Key Mesothelioma Facts*, Mesothelioma.com, https://www.mesothelioma.com/mesothelioma/statistics/ (last visited May 10, 2023).

[33] *Mapping the Deadly Toll of Asbestos – State by State, County by County,* AsbestosNation.com, http://www.asbestosnation.org/facts/asbestos-deaths/ (last visited May 10, 2023).

Case ID: 220602694

146.     Upon information and belief, Factory Mutual contends that the Flyers did not suffer "direct physical loss or damage."  To be clear, Plaintiff alleges that COVID-19 was present on the property, causing physical alteration thereof, and this alteration rendered the property dangerous, forcing closure and other restrictions on its use of the premises.

147.     The "Period of Liability" provision establishes the time period during which Factory Mutual will be obligated to provide coverage for Time Element losses.  For Time Element losses measured other than by Gross Profit, this provision prescribes that the Period of Liability begins when the policyholder suffers "physical loss or damage of the type insured" and ends "when with due diligence and dispatch" the covered property could be "(i) repaired or replaced; and (ii) made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage."  The "period of restoration" provision establishes a *hypothetical* time period for business interruption loss—i.e., the period of restoration ends when the property "***could*** be" repaired or replaced—and thus does not require that the property must actually be repaired, rebuilt or replaced in order to trigger coverage.

148.     For Time Element Coverage for losses measured by Gross Profit, this provision establishes that the Period of Liability begins when the policyholder suffers "physical loss or damage of the type insured" and ends not later than the period of time shown in the Declarations, which is 12 months (i.e., *without* requiring repair or replacement of property).

149.     These provisions govern the duration of coverage; they do not govern whether coverage is triggered, nor do they impose any prerequisite to coverage.  The Flyers will provide evidence regarding the duration of the "Period of Liability" during the course and scope of this litigation.

Case ID: 220602694

150.    The Policy does not require a complete cessation of business in order to trigger business interruption coverage.

151.    The Policy also requires the insured to mitigate its losses.  For example, the Policy provides that business income loss is insured only to the extent it cannot be reduced by the use of the property.  Exhibit 1, at p. 36.

152.    Additionally, under the "Requirements in Case of Loss" section, the Policy states: "The Insured will: . . . protect the property from further loss or damage."  Exhibit 1, at p. 59.

153.    Any interpretation that requires a property to be completely uninhabitable or unusable in order to trigger coverage flies directly in the face of these express policy requirements that the Flyers must seek to mitigate their loss by attempting to use as much of their property as possible despite a covered loss, and would ignore that the policy covers not just total business interruption, but also partial interruptions.

154.    Factory Mutual misapplies the Policy it drafted, contrary to its obligations to the Flyers.  The insuring agreement covers "*risks of* physical loss or damage." (emphasis added).  The Policy therefore provides business interruption coverage when the insured suffers an interruption of its business activities due to the "risks" of the Pandemic causing physical loss or damage to covered property, in addition to any actual loss or damage.

155.    Factory Mutual also misapplies the law, which has long held that the presence of a dangerous (to humans) invisible substance at or on a property, including within the airspace of a covered premises, constitutes "physical loss or damage" to property.

156.    Factory Mutual's failure to provide full coverage is contrary to its widely publicized representations that it is an expert in underwriting and studying casualty-related risks and tailoring property coverage to a client's actual exposures.

41

157.   Factory Mutual's failure to provide full coverage is contrary to its prior admissions and statements made to state regulators that communicable disease causes physical damage to property.

158.   Factory Mutual's failure to provide full coverage is contrary to its prior admissions and statements made to state regulators that the Contamination Exclusion is limited to traditional pollution.

159.   In its Policy, Factory Mutual covered the risks associated with Communicable Disease (as defined by the Policy) by providing broad coverage when Communicable Disease involves "all risks of direct physical loss of or damage," and narrow sublimited coverage when Communicable Disease is actually present and does not involve direct physical damage to property.  Factory Mutual provided both broad and narrow coverages, without including an applicable exclusion or other limitation that would preclude coverage in the event of a pandemic for circumstances such as those at issue here that have caused significant Time Element loss for the Flyers.

160.   The Flyers are entitled to coverage up to the full applicable limits of the Policy.

## COUNT I

## BREACH OF CONTRACT

161.   Plaintiff realleges and incorporate by reference all preceding allegations as if fully stated herein.

162.   The Policy is a valid and enforceable contract between the parties.

163.   Plaintiff has sustained, and continues to sustain, losses covered under the Policy.

164.    Plaintiff has complied with all terms and conditions contained in the Policy except to the extent its performance has been or is excused or waived by Factory Mutual.

42

Case ID: 220602694

165.     Factory Mutual breached the Policy by, among other things, failing to pay for the losses Plaintiff sustained.

166.     As a direct and proximate result of Factory Mutual's acts and breaches, Plaintiff has been damaged, and continues to be damaged, in an amount that exceeds the Court's jurisdictional limits and that will be established at trial.

**COUNT II**

**DECLARATORY JUDGMENT – POLICY COVERAGE**

167.     Plaintiff realleages and incorporate by reference all preceding allegations as if fully stated herein.

168.     Plaintiff seeks declaration by this Court of their rights and the obligations of Factory Mutual under the contractual agreement to provide coverage for the Flyers' losses.

169.     Plaintiffs contend that Factory Mutual has a duty to pay for its losses caused by the risks of the Pandemic, pursuant to the terms and conditions under multiple coverages of the Policy.  Factory Mutual disputes Plaintiff's contentions.

170.     Factory Mutual contends that coverage under the Policy is limited to Communicable Disease Response and Interruption by Communicable Disease, and its associated policy limit.

171.     Plaintiff contends that the Policy provides full policy limits coverage for their losses and that Factory Mutual's coverage analysis to date is contrary to the Policy, the law, and public policy.

172.     Plaintiff contends that the Policy must be interpreted in a reasonable manner to provide the coverage that the parties intended and understood was being provided, and that is in accord with the Flyers' reasonable expectations.

Case ID: 220602694

173.     Plaintiff is informed and believe, and on that basis allege, that Factory Mutual disputes these contentions.

174.     An actual and justiciable controversy exists between Plaintiff and Defendant concerning the matters alleged herein.

175.     Plaintiff is entitled to a judicial declaration by the Court pursuant to the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541 confirming: that Factory Mutual's contentions as stated above are wrong, and that Plaintiff's contentions as stated above are correct; that Factory Mutual must honor all duties under its Policy, including its duty to pay for the full amount of losses incurred as a result of the risks of the Coronavirus pandemic; and that because of Factory Mutual's conduct, Plaintiff is excused from performing or complying with any conditions and duties otherwise imposed on Plaintiff by the Policy.

176.     Declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

## COUNT III

## DECLARATORY JUDGMENT – REGULATORY ESTOPPEL

177.     Plaintiff realleges and incorporate by reference all preceding allegations as if fully stated herein.

178.     In the course of seeking regulatory approval to sell its standard property form to consumers, including the "Advantage – TE Select – United States – 2016 (2019 update)" that was sold to the Flyers, Factory Mutual made numerous representations and admissions to state insurance regulators about the scope of coverage provided by this form and Contamination exclusion contained in this form, which contradict the assertions that Factory is now making its quest to avoid coverage for the Flyers' claims.  Under the regulatory estoppel doctrine, Factory

44

Case ID: 220602694

Mutual is now estopped from asserting that the Policy does not afford coverage for the Flyers' losses.  *See Sunbeam Corp. v. Liberty Mut. Ins. Co.,* 566 Pa. 494, 781 A.2d 1189 (2001).

179.    As is also set forth above, at the time it sought approval of the same version of the Contamination exclusion, as sold to the Flyers, the Flyers are informed and believe that Factory Mutual expressly represented to state insurance regulators including in Pennsylvania that the exclusion did not reduce coverage to consumers from the previous version of the exclusion that was strictly limited to traditional environmental pollution. Factory Mutual is therefore estopped under the doctrine of regulatory estoppel from representing to the Court and the Flyers that "virus" or pandemic is encompassed by the Contamination exclusion, or enforcing the Contamination exclusion against the Flyers to bar coverage for the Flyers' Pandemic-related losses.

180.    If regulatory estoppel is established, this doctrine prevents Factory Mutual from enforcing misrepresented policy language, even if the Court otherwise would find that it clearly and unambiguously prevents coverage (here, in any event, the challenged policy language does not clearly and unambiguously apply in Factory Mutual's favor).  *Sunbeam,* supra.

181.    An actual and justiciable controversy exists between Plaintiff and Defendant concerning the matters alleged herein.

182.    Plaintiff is entitled to a judicial declaration by the Court pursuant to the Declaratory Judgments Act, 42 Pa.C.S. §§ 7531-7541 confirming that the doctrine of regulatory estoppel precludes Factory Mutual from asserting that "virus" or pandemic is encompassed by the Contamination exclusion, and from enforcing the Contamination exclusion against the Flyers to bar coverage for the Flyers' Pandemic-related losses.

45

Case ID: 220602694

## PRAYER FOR RELIEF

WHEREFORE, the Flyers pray for judgment as follows:

     a.     Judgment in favor of Plaintiff and against Factory Mutual;

     b.     Declaratory Judgment as set forth in Count II above;

     c.     Declaratory Judgment as set forth in Count III above;

     d.     An award of attorney's fees and costs of suit incurred; and

     e.     Such other and further relief as the Court deems proper.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury consisting of 12 members on all claims, issues, and disputed issues of fact so triable.

Dated:  June 7, 2023

Respectfully submitted,

**BLANK ROME LLP**
By: /s/ Charles A. Fitzpatrick IV
CHARLES A. FITZPATRICK IV (PA Bar 309113)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone:  215.569.5608
Facsimile:  215.832.5608
Email: Charles.Fitzpatrick@blankrome.com

LINDA KORNFELD (pro hac vice forthcoming)
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Telephone:  424.239.3400
Facsimile:  424.239.3434
Email: Linda.Kornfeld@blankrome.com

Attorneys for Plaintiff Comcast Spectacor, LLC

46

## <u>VERIFICATION</u>

I, Blair Listino, hereby verify that, as Executive Vice President & Chief Financial Officer of Comcast Spectacor, LLC, I am authorized to make this verification on behalf of Comcast Spectacor, LLC, and that the facts set forth in the foregoing Complaint are true and correct to the best of my knowledge, information and belief.  I understand that the statements herein are made subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

Dated: _____          Signed: _____

*Filed and Attested by the Office of Judicial Records 16 JUN 2023 11:32 am B. MERCEDES*

## CERTIFICATE OF SERVICE

Filed and Attested by the
Office of Judicial Records
08 JUN 2023 11:23 am
B. MERCEDES

I, Charles A. Fitzpatrick IV, Esq. hereby certify that on this 8th day of June 2023, I caused a true and accurate copy of the foregoing to be served via the Court's ECF system upon all counsel of record.

/s/ Charles A. Fitzpatrick IV

**BLANK ROME LLP**
Charles A. Fitzpatrick IV, Esq. (No. 309113)
One Logan Square
130 N. 18th Street
Philadelphia, Pennsylvania 19103
Phone: (215) 569-5600
Facsimile: (215) 832-5608
Charles.Fitzpatrick@BlankRome.com

*Filed and Attested by the
Office of Judicial Records
08 JUN 2023 03:49 pm
J. LOWELL*

**BLANK ROME LLP**
Linda Kornfeld (pro hac vice forthcoming)
2029 Century Park East, 6th Floor
Los Angeles, California 90067
Phone: (424) 239-3400
Facsimile: (424) 239-3434
Linda.Kornfeld@BlankRome.com

*Counsel for Plaintiff*
*Comcast Spectacor, LLC*

| | | |
|---|---|---|
| **COMCAST SPECTACOR, LLC** | : | COURT OF COMMON PLEAS |
| 3601 South Broad Street | : | PHILADELPHIA COUNTY |
| Philadelphia, PA 19148 | : | |
| | : | COMMERCE PROGRAM |
| Plaintiff, | : | |
| | : | JUNE TERM, 2022 |
| v. | : | |
| | : | CIVIL ACTION - LAW |
| **FACTORY MUTUAL INSURANCE** | : | |
| **COMPANY** | : | Case ID No. 220602694 |
| P.O. Box 7500 | : | |
| Johnston, RI 02919 | : | *Jury Trial Demanded* |
| | : | |
| Defendant. | : | |

## PRAECIPE TO SUPPLEMENT/ATTACH DOCUMENT

TO THE OFFICE OF JUDICIAL RECORDS:

Kindly attach the enclosed document as the signed Verification to Plaintiff's Complaint

and Jury Demand, which was filed on June 8, 2023.

Dated:  June 8, 2023                              Respectfully submitted,

                                                  **BLANK ROME LLP**
                                                  By: /s/ Charles A. Fitzpatrick IV
                                                  CHARLES A. FITZPATRICK IV (PA Bar
                                                  309113)
                                                  One Logan Square
                                                  130 North 18th Street
                                                  Philadelphia, PA 19103
                                                  Telephone:  215.569.5608
                                                  Facsimile:  215.832.5608
                                                  Email: Charles.Fitzpatrick@blankrome.com

                                                  LINDA KORNFELD (pro hac vice
                                                  forthcoming)
                                                  2029 Century Park East, 6th Floor
                                                  Los Angeles, CA 90067
                                                  Telephone:  424.239.3400
                                                  Facsimile:  424.239.3434
                                                  Email: Linda.Kornfeld@blankrome.com

                                                  Attorneys for Plaintiff Comcast Spectacor,
                                                  LLC

Case ID: 220602694

**<u>CERTIFICATE OF SERVICE</u>**

I, Charles A. Fitzpatrick IV, Esq. hereby certify that on this 8th day of June, 2023 I caused a true and accurate copy of the foregoing to be served via the Court's ECF system upon all counsel of record.

<u>/s/ Charles A. Fitzpatrick IV</u>

**<u>VERIFICATION</u>**

*Filed and Attested by the
Office of Judicial Records
06 JUN 2023 04:44 pm
I. LOWELL*

I, Blair Listino, hereby verify that, as Executive Vice President & Chief Financial Officer

of Comcast Spectacor, LLC, I am authorized to make this verification on behalf of Comcast

Spectacor, LLC, and that the facts set forth in the foregoing Complaint are true and correct to the

best of my knowledge, information and belief.  I understand that the statements herein are made

subject to the penalties of 18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

Dated: 06/08/2023          Signed: